# EXHIBIT E

SUPERIOR COURT
STAMFORD-NORWALK
JUDICIAL DISTRICT

FSTCV136019828S          2018 JUN 28  P 2 07    CONNECTICUT SUPERIOR COURT

SUSANNE WAHBA                    :    JUDICIAL DISTRICT OF STAMFORD/

VS.                             :          NORWALK AT STAMFORD

JP MORGAN CHASE BANK, N.A.          June 28, 2018

## MEMORANDUM OF DECISION

This is a mortgage foreclosure case that has taken a somewhat torturous path. Somewhat preemptively, the plaintiff commenced an action against the defendant, claiming that it had engaged in unfair trade practices with respect to a mortgage loan and subsequent handling of the loan including attempts by the plaintiff to seek modification of the terms of the underlying debt. The plaintiff contended that that conduct justified relief under the Connecticut Unfair Trade Practices Act (CUTPA).[1] After initially filing an answer and special defenses, the defendant amended its responsive pleading by adding a counterclaim, seeking to foreclose on the subject property.

The case was commenced in September 2013, and the plaintiff's claims against the defendant under CUTPA were tried to a jury in March of 2017. The jury rendered a verdict for the defendant, finding that the plaintiff failed to prove her claim of CUTPA liability.

Subsequently, the remainder of the case being prosecuted by the defendant (the foreclosure counterclaim), was tried to the court on October 26, 2017. The parties submitted post-trial briefs and replies, the last being filed on March 1, 2018.

---

[1] Initially, there had been a second count, seeking to quiet title. However, summary judgment was granted (in part), granting judgment in favor of the defendant on the quiet title count. (See, #111.03).

1

218.00

The plaintiff does not contest, in any serious affirmative sense, the defendant's prima facie entitlement to foreclosure. Thus, the initial brief filed by the plaintiff offers no challenge to the existence of a note and mortgage duly executed by the plaintiff, the defendant's possession and right to enforce, the plaintiff's failure to make payments resulting in a default, issuance of a default notice, and eventual commencement of the counterclaim. Rather, the focus is on the claimed existence of defenses to the foreclosure, including unclean hands and other inequitable conduct.

Before moving on to the actual battleground, the court must make the requisite findings, based on the proof submitted by the defendant which, as noted above, has not been contested in any significant fashion.[2] The court finds that the defendant proved that it is in possession of the note and mortgage, and is entitled to enforce the instruments. The court further finds that notice of default properly was issued, satisfying a condition for pursuing this foreclosure proceeding. The court further finds that the defendant has established that the debt, as of the date of trial on October 26, 2017, was $5,917,276.33 (Exhibit Z), and that the fair market value of the property as of that date was $6.7 million (Exhibit W). Absent a valid defense – essentially the focus of the remainder of this decision – the defendant has established its (prima facie) entitlement to a judgment of foreclosure.

Before identifying the specifics of the claims being advanced by the plaintiff and the evidence submitted by the parties relating to those issues, the court is required to address some preliminary matters, which relate to identification of issues and evidence that properly may be considered by the court.

---

[2] Although not discussed in any detail in the plaintiff's post-hearing submissions, there was some challenge, during the presentation of evidence, concerning records relating to notice of default being sent to the plaintiff.

In her post-trial submissions, the plaintiff makes a number of references to materials that were not allowed into evidence for purposes of the jury trial on the CUTPA claim, claiming that such proffers *now* should be considered by the court. The problem that the court must confront, however, is that consideration of evidence is not a free-form process, but requires some level of procedural regularity, with the opposing party having a fair opportunity to object, and if evidence were to be admitted over objection, having a fair opportunity to try to offer contrary evidence (or explain away the admitted evidence).

Additionally, the defendant might object to the evidence in connection with this phase of the proceedings on grounds other than the grounds upon which the court rejected the evidence before the jury. For example, if evidence had been excluded because the prejudicial impact outweighed any probative value, that might be less of a concern in a trial to the court, but there may be other issues that would warrant rejection of the evidence at this time.

The court recognizes that current counsel for the plaintiff was not involved in this case at the time of the jury trial. The trial date for this phase of the proceedings was scheduled in an attempt to ensure that current counsel had an adequate opportunity to prepare for this second phase. If additional evidence had been offered during the courtside phase of the case, the court would have had an opportunity to hear objections and make a decision as to admissibility for the purpose of the current phase of the dispute. The court cannot consider evidence that is not part of the record and it is clear that the defendant objects to the consideration of such external matters, at this time. Accordingly, the court cannot consider the evidence that the plaintiff, in her post-hearing submissions, asks the court to consider.

3

Conversely, the court notes that the defendant takes the position that the jury rejection of the CUTPA claims, as reflected in the jury's verdict and interrogatory responses, is essentially determinative of the defenses now being pressed by the plaintiff. Although the defendant may be correct in contending that the same conduct, claimed to justify relief under CUTPA, also underlies the equitable defenses being asserted, there is not a perfect congruence. The jury had not been asked to determine whether the defendant had acted inequitably in absolute terms, but had been asked whether the defendant had acted sufficiently inequitably as to warrant relief under CUTPA. An imperfect but apt analogy is that it is well established that a mere breach of contract does not necessarily implicate a violation of CUTPA, such that a jury rejection of a CUTPA claim involving a breach of contract would not necessarily mean that the jury did not find a breach of contract. Unless the threshold for finding a CUTPA violation were equivalent to the threshold for proof of unclean hands or another equitable defense, the jury's rejection of CUTPA liability cannot be considered to have a collateral estoppel effect with respect to equitable defenses raised in the foreclosure phase.

That is not to say that the court must ignore the jury determination. The jury found that the conduct did not rise to a CUTPA-violation level, which implies that the conduct, if inequitable, was not sufficiently egregious to satisfy the statutory requirement, but did not rule out the possibility that it might satisfy some other – especially possibly lesser – standard. Accordingly, the court cannot accept the verdict as a determination of no inequitable conduct, but must recognize that it signifies a somewhat symbolic "cap" on how extreme the conduct could be deemed to have been.

The history as recited in the first phase of the proceedings is necessary for an understanding of the current dispute. The plaintiff and her husband purchased

4

the subject property in the 1970's (around 1975) and the property has been subject to different mortgages over the years. The plaintiff's husband, at times, was on the title at times, but not during the time frame of relevance to this dispute.

Prior to any involvement by the defendant, the plaintiff had most recently obtained a mortgage loan (apparently a refinance) from Washington Mutual, and immediately before Washington Mutual was taken over by federal regulators (Washington Mutual having been determined to be a failing institution), there had been discussions and an application for a new loan arrangement with Washington Mutual. Within days of the takeover and subsequent transfer of most Washington Mutual assets/loans/mortgages to the defendant, a modification was consummated with the defendant. The plaintiff had been hoping for a more favorable arrangement, and the new arrangement was of concern to the plaintiff as the new terms included payment at a higher rate of interest. (Without the modification, the rate would not have increased somewhat minimally, but there would have been a requirement of payments towards principal which would have had a major impact on monthly payments.) The plaintiff claimed that her husband had been told[3] that they had to agree to the new arrangement, but that a more favorable rate would be available once the new agreement was in place – lower rate and lower payments (and the plaintiff also was seeking an extended period of time for payments to be made). The goal of the plaintiff had been to have the interest rate reduced to somewhere around 3% from the interest-only rate of 4.5% as originally established in 2003 (and which was scheduled to be adjusted upward as to rate (4.75%), and would begin to include principal payments, in late 2008).

---

[3] The plaintiff had authorized her husband to act on her behalf with the defendant and Washington Mutual. Therefore, most of the information related by the plaintiff actually was based on her husband's discussions with lenders and what her husband had told her had happened (although at times she may have been on the telephone at the same time).

The plaintiff also claimed that her husband had been told that they needed to miss at least three payments to be eligible for a rate reduction, after the September 2008 modification.[4] This opens a theme running throughout the case, not only in the current phase but also somewhat central to the unsuccessful CUTPA claim. The plaintiff and her husband repeatedly stated that they had been told repeatedly that in order to get better terms, the plaintiff would have to skip or miss a number of payments, typically three. Although the connection was not made explicitly, it seems clear that the plaintiff sought to avail herself of advantageous terms – rate, term, and possible lowering of principal – available to those in default on their mortgages, as part of the then relatively new strategies of trying to avoid foreclosures by creative measures, involving modification of terms of a mortgage loan. In other words – and at the risk of oversimplification – the plaintiff wanted to take advantage of options available to those in financial distress (relating to mortgage loans) even though she may not have been (at the time) in financial distress with respect to her mortgage loan, and she had been told that the only way to take advantage of such programs (designed for people having trouble with their mortgages) was to put herself into a position of seemingly having trouble with her mortgage, i.e., failing to make 3 payments.

As something of an aside, the plaintiff's post-hearing submissions seem to suggest that the plaintiff was in some form of financial distress as of the 2008 modification. The court's recollection of the evidence and the context of the evidence, however, led the court to the impression that there either was no financial distress in late 2008 or that if there were any distress, it had not been manifested at

---

[4] At times, the claim was that they had been told about the need for missed payments before the 2008 agreement actually was executed – but that necessarily would have been statements made by personnel acting as representatives of Washington Mutual rather than defendant – due to the actual timing of events.

the time. While it may have been a matter of pride or avoidance of embarrassment, the court was left with the distinct impression that the motivation for reductions in payment primarily was a non-uncommon desire to minimize a cost that might be subject to adjustment, rather than dire circumstances requiring action (with an "or else" quality).

The absence of any patent or clearly articulated financial distress is consistent with some of the complaints made by the plaintiff, concerning the defendant's actions during the period 2008-2012. On one occasion, she was told that their income was too high, for a program for which she had applied. Although not directly linked, that would be consistent with an application for a program intended for persons in some financial distress, where income beyond a certain level might be deemed a disqualification (as it might be perceived to negate a real financial hardship).[5] On another occasion, substantially later, she had been told that their income was too low. Assuming that this was an application for a different program (it was not stated whether it was the same program or if the income reported on the relevant application had changed), that might be attributable to a program with less of a focus on distressed borrowers and more in the nature of a refinance.

More fundamentally, the plaintiff is complaining about the consequences of what the court perceived to have been a persistent search for more favorable terms, notwithstanding existing obligations. In 2003, the initial mortgage loan of relevance was obtained from Washington Mutual, allowing the plaintiff to extract some equity from the property. The loan provided for 5 years of interest-only payments, but at the end of 2008, the interest rate would be adjusted and there would be an

---

[5] Exhibit 3, the 2012 loan modification agreement, contains an explicit (required) representation of hardship, either having caused or likely to cause a default on existing obligations.

obligation to begin paying principal (with payments increasing by almost 50%[6]). Rather than paying the substantially-higher payments that would start to be required, the plaintiff approached Washington Mutual about a new arrangement, which resulted in a proposal for a new rate – substantially higher than the expiring rate and substantially higher than the new rate to which the old loan would have adjusted – but without principal payments being required (at least initially). This was coupled with claimed representations that future adjustments or program-based relief might be available, but without any evidence presented to the court of an actual or represented hardship that might justify some form of foreclosure-avoidance relief.

Just days before the closing on the new loan, Washington Mutual was taken over by federal regulators and most of its business – including the existing and proposed loan with the plaintiff – was transferred to the defendant. Although the plaintiff and her husband indicated that the terms of the new loan, when they learned of them shortly before the closing on the loan – especially the higher rate (6.125% instead of the expiring 4.5% and the expected replacement rate of 4.75%) – were of great concern and upsetting, they did not contact the defendant about seeking a lower rate, did not ask for more time to consider the desirability of the new transaction, or otherwise outwardly express concerns about the new terms. Most obviously, the plaintiff chose to accept the new arrangement despite her (and her husband's) dissatisfaction. The plaintiff's husband claimed that they had been hoping for a rate in the area of 3% but generally acknowledged that no one had formally committed to a rate of that magnitude, and there was no evidence that such a rate was generally available (especially for a borrower who, at the time, was not behind in payments so as to be potentially eligible for remedial programs).

---

[6] Assuming no additional increase due to an increase in the interest rate.

A complicating – or at least potentially confusion-inducing – factor was that the personnel who had been at Washington Mutual while the plaintiff had been discussing changes to her loan relationship with the lender, transitioned to the defendant such that the plaintiff continued dealing with essentially the same people. Prior to the takeover of Washington Mutual, those loan officers/representatives had been employees or agents of Washington Mutual; after the takeover, they apparently became loan officers/representatives of the defendant, but the plaintiff has not established that their conduct as representatives of Washington Mutual was chargeable to the defendant in a vicarious liability sense. While a merger or arms-length acquisition might entail continuation of any liability created by agents prior to the consolidation, the plaintiff has not established any basis for continuation of inchoate liability based on prior acts (representations) of agents, in a failed-bank-takeover situation, particularly when the actual (new) loan transaction did not involve the former entity.

Synthesizing the foregoing, then, as the fall of 2008 approached, the plaintiff knew that her interest-only loan was about to have a rate adjustment and a requirement of payments towards principal, which would result in a substantial increase in monthly payments. She (chiefly through her husband) sought better terms, and the loan that was proposed was not especially satisfactory – but she agreed to its terms without any identified complaints to the actual lending party at the time of the transaction (the defendant as then-very-recent successor to failed-Washington Mutual's portfolio).

Over the course of the next 3½ years, into 2012, the plaintiff submitted applications for various modifications or programs, seeking more advantageous terms for her mortgage loan. She failed to obtain approval of new loan terms until 2012, when the currently-operative loan agreement was executed. However, the

9

plaintiff has claimed that by the time she obtained loan relief in 2012, there had been such a substantial drain on her resources that she could not keep current, leading to the current default status and resulting application by the defendant for foreclosure. (The plaintiff has acknowledged that no payments have been made for a number of years.)

The court does not find this explanation to be credible, based on an admittedly-rough analysis of the available data. As part of the 2012 modification, approximately $347,000 was capitalized, representing (presumably) additional amounts owed by the plaintiff to the defendant at that time. Assuming that the aggregate figure included late charges, and assuming that the plaintiff had not made any payments in a timely manner between the execution of the 2008 modification and the 2012 modification – approximately 44 months – that would bring the capitalized figure (excluding late charges) down to approximately $295,000. That figure, averaged over 44 months, reflects an average monthly shortfall in payments of approximately $6700. The increase in monthly payments, from the 2003 agreement to the 2008 agreement was approximately $6093 ($22,968 less $16,875). Therefore, as measured by the 2003 agreement which had required monthly payments of $16,875, the plaintiff appears to have been averaging less than that as a monthly payment for the life of the 2008 agreement ($22,968 due less an average shortfall of $6700) – indicating average monthly payments of approximately $16,268. (The court has assumed that escrow payments (or direct payments for taxes and insurance) would have remained relatively constant, notwithstanding the likelihood that property taxes increased, if modestly, over the relevant years.)[7] The plaintiff's effort to blame the defendant for her inability to make

---

[7] The $16,875 figure was the actual monthly payment, based on the expiring 4.5% rate; assuming that the rate adjustment to 4.75% had gone into effect (but without any requirement of payment of principal), the monthly payment would have increased by more

payments under the 2012 agreement, initially in the amount of $14,678, due to the onerous nature of the obligations under the 2008 agreement, rings hollow, as the plaintiff does not appear to have been covering mortgage related expenses even as measured by the expiring 2003 payment figure,[8] and the new figure for monthly payments was even less than before (albeit only for a limited period of time). Other than conclusory assertions, the court is unaware of any (credible) evidence that might support a contention that the claimed additional burdens assumed by the plaintiff as a result of the 2008 agreement depleted her resources to the point that she could not satisfy the lessened burdens set forth in the 2012 agreement.

At this juncture, the court must recognize the limits or scope of a proper defense in a foreclosure action.

> "'Historically, defenses to a foreclosure action have been limited to payment, discharge, release or satisfaction ... or, if there had never been a valid lien. ... A valid special defense at law to a foreclosure proceeding must be legally sufficient and address the making, validity or enforcement of the mortgage, the note, or both. ... Where the plaintiff's conduct is inequitable, a court may withhold foreclosure on equitable considerations and principles. ... [O]ur courts have permitted several equitable defenses to a foreclosure action. [I]f the mortgagor is prevented by accident, mistake or fraud, from fulfilling a condition of the mortgage, foreclosure cannot be had .... Other equitable defenses that our Supreme Court has recognized in foreclosure actions include unconscionability ... abandonment of security ... and usury.' (Citation omitted; internal quotation marks omitted.) *LaSalle National Bank* v. *Freshfield Meadows, LLC*, 69 Conn.App. 824, 833–34, 798 A.2d 445

---

than $900, such that the increase in monthly payments (interest only), using a monthly figure based on that adjusted interest rate as the benchmark, would have been less than $5200, as measured against a shortfall averaging $6700.

[8] The court recognizes that there were other miscellaneous expenses chargeable to the plaintiff, e.g. "corporate advances," but those charges were relatively minimal with respect to the magnitude of the figures discussed in this paragraph.

11

(2002)." *U.S. Bank National Association v. Blowers*, 177 Conn. App. 622, 629, 172 A.3d 837, 841 (2017); cert. granted, 328 Conn. 904 (2018).[9]

The immediately-following discussion of defenses in *Blowers* is instructive:

> In the present case, neither of the defendants' special defenses at issue directly attacks the making, validity, or enforcement of the note or mortgage. All events giving rise to the special defenses took place during the loan modification negotiation period or during foreclosure mediation. This court previously has held that alleged improper conduct occurring during mediation and modification negotiations lacked any reasonable nexus to the making, validity or enforcement of the mortgage or note .... By contrast, if the modification negotiations ultimately result in a final, binding, loan modification, and the mortgagee subsequently breaches the terms of that new modification, then any special defenses asserted by the mortgagor in regard to that breach would relate to the enforcement of the mortgage. In the present case, however, no binding modification was ever agreed upon by the parties. Accordingly, the special defenses raised by the defendants do not relate to the making, validity, or enforcement of the note or mortgage." (Internal quotation marks and citations, omitted.) Id. at 629-30.

---

[9] The issues certified for review by the Supreme Court are:

"1. Did the Appellate Court properly hold that (a) special defenses to a foreclosure action must 'directly attack' the making, validity, or enforcement of the note or mortgage, and (b) counterclaims in a foreclosure action must also satisfy the 'making, validity, or enforcement' requirement? See Practice Book § 10–10.

"2. If the Appellate Court properly addressed the issues in the first question, did it properly hold that alleged postorigination misconduct concerns a plaintiff's 'enforcement' of a note or mortgage only if the plaintiff breaches a loan modification or other similar agreement that affects the enforceability of the note or mortgage?

"3. If the Appellate Court properly addressed the issues in the first and second questions, did it properly hold that the defendants' allegations of the plaintiff's misconduct and breach relating to a 'received' 'immediate modification' did not amount to an allegation that the plaintiff had agreed to a 'final, binding loan modification' that affected the plaintiffs ability to enforce the note or mortgage?"

This case differs insofar as there was, eventually, a loan modification. That requires a careful examination of the basis for the plaintiff's complaints, and the mortgage with which any claimed inequitable conduct was associated.

To the extent that the plaintiff is complaining about conduct during the process leading up to the eventual loan modification, that would run afoul of the statement, above, that "[t]his court previously has held that alleged improper conduct occurring during mediation and modification negotiations lacked 'any reasonable nexus to the making, validity or enforcement of the mortgage or note." If the plaintiff is focusing on the subsequent, modified agreement, there is no conduct that has been alleged relating to breach of "the terms of that new modification, [such that] any special defenses asserted by the mortgagor in regard to that breach would relate to the enforcement of the mortgage." As to the modified agreement in 2012, the only complaint appears to be that it came "too late" and that the plaintiff's financial situation had deteriorated under the terms of the 2008 agreement which had been in effect until then.

Even if the focus were on the 2008 agreement, there would be a similar impediment to applicability of equitable defenses. The record reflects that the defendant played no role in the negotiation or determination of terms of the 2008 loan agreement, which was the source of dissatisfaction. The plaintiff had applied to Washington Mutual, and the closing on that new agreement occurred virtually immediately after Washington Mutual had been taken over due to its failure/insolvency, with defendant following through with the agreement that had been reached just prior to its taking over Washington Mutual's mortgage business. Again, the plaintiff acknowledged that she had not complained to defendant about the terms of the 2008 agreement, and acknowledged that she had executed the necessary paperwork to enter into the new agreement – superseding the 2003

agreement which was due for changes that the plaintiff wished to avoid. The record is devoid of any credible evidence that the defendant did anything relating to the formation of the 2008 agreement other than executing the agreement on terms that had been established by Washington Mutual – with or without input from the plaintiff. For that same reason, nothing that transpired after execution of the 2008 agreement – focusing on conduct of the defendant – implicated the validity of the agreement. Finally, recognizing that this application for foreclosure relies upon the 2012 agreement, whatever conduct transpired between 2008 and 2012 – aside from the already-quoted observation that "alleged improper conduct occurring during mediation and modification negotiations lacked 'any reasonable nexus to the making, validity or enforcement of the mortgage or note" – here there is no attempt to enforce that earlier note.

The court recognizes distinctions between this case and *Blowers*, but at least some distinctions point more forcefully in the direction of the defendant. Procedurally, in *Blowers*, the court's disposition of the special defenses (and counterclaims) was by way of motion to strike, which requires a more absolute and theoretical evaluation – that the defenses cannot be sufficient as a matter of law, as opposed to a determination that they are insufficient in the case at hand based in actual facts presented to the court. Further, the factual assertions in *Blowers* were more extreme as to misconduct, in that there were claims that offers had been made but were subsequently withdrawn, including at least one instance in which the mortgagor successfully had completed a trial period for a modification, only to have the proposed modification withdrawn (eliciting a claim that there had been an agreed modification, prior to withdrawal of that modification). There was no claim of comparable egregious conduct here (although there was evidence of some trial

situations), and again, there eventually was a modification, to which the plaintiff agreed, and which became the basis for the current foreclosure proceeding.

The court's analysis also is informed by *JPMorgan Chase Bank, National Association v. Essaghof*, 177 Conn. App. 144, 159, 171 A.3d 494, 504 (2017); cert. granted, 328 Conn. 915 (2018).[10] In *Essaghof*, there had been an executed loan modification with Washington Mutual, and the claim was that the new agreement had been fraudulently induced or had been executed based on sufficiently inequitable conduct as to warrant application of the concept of unclean hands. The arguments were rejected by the trial court, which was affirmed on appeal. There as here, there were benefits and detriments, relating to interest rates, term of payment, monthly payments, etc., and there as here, the borrower was not a novice to the process. An element lacking here is any claim that there was pressure to execute a new agreement as quickly as possible – Washington Mutual was no longer the entity with which the plaintiff was dealing, and there is no suggestion that the defendant pressured the plaintiff to enter into a new agreement. Rather, the evidence was that notwithstanding dissatisfaction with the terms of the 2008 agreement, the plaintiff simply executed it, without complaint or apparent request for any delay to pursue alternatives.

At this point, it is appropriate for the court to identify and discuss an issue that is implicit in some of the discussion above, but requires some level of highlighting. In 2008, as the end of the year was approaching, the plaintiff had an existing loan obligation and associated mortgage, and the terms of the loan were about to change by operation of its own provisions. The plaintiff perceived the substantially-increased payments that would be required – slightly higher interest

---

[10] Certification was granted with respect to the order that the mortgagor reimburse the mortgagee for property taxes and insurance.

rate but also including principal – as somewhat onerous, and was seeking to obtain some level of relief. The plaintiff has failed to distinguish in any clear manner, however, the distinction between seeking to negotiate a new loan agreement, whether characterized as a refinance or otherwise, and the application of a program intended for distressed borrowers. When she had executed the loan documents in 2003, she knew that the terms of the agreement required her to start making principal payments at the end of 2008, which aside from the relatively small increment in interest, would have resulted in a substantial increase in monthly payments (approximately 50%). Amortizing a loan of approximately $4.5 million over the 25 years remaining on the term of the loan, would have necessitated a substantial increase in monthly payments, even if the rate of interest had remained steady. The plaintiff wished to minimize monthly payments, and the agreed mechanism to do so, in the context of the existing loan, was to defer principal payments for another 5 years. The plaintiff had been free to try to refinance with Washington Mutual or any other lender with more favorable terms, especially since there is nothing in the 2008 loan agreement that suggests that it was an arrangement under some form of foreclosure relief program (in contrast to the 2012 agreement that contains language suggestive of such a program; see footnote 5). Although there often is a lack of clarity in the exhibits and the testimony of the plaintiff and her husband as to seeking to renegotiate as a distressed borrower or as a borrower simply seeking better terms, the court cannot conclude that there was any material inequitable conduct by the defendant or its representatives in this regard – rather, there was an overarching goal of the plaintiff to attain a minimum level of payments (for as long as possible), and the mechanism by which that goal was attained seems to have been of at-best secondary concern.

That, however, has implicated some level of lack of precision in testimony and contents of documentary evidence, compounded by the moderately extended time period involved. Although some of the documentary evidence is suggestive to the contrary, the testimony presented to the court implied that the plaintiff had been current with all payments on her mortgage loan obligations prior to the 2008 modification with defendant. It defies reasonable credulity to believe that the plaintiff never asked anyone, when told that she should miss a few payments intentionally, why she should do so – unless she already knew that that would be a prerequisite to eligibility for a foreclosure relief/avoidance program. (There are some documentary references to the suggestion/need to miss some payments even prior to the 2008 agreement (although as noted elsewhere, the reliability of some of the materials generated by the plaintiff is suspect).)

Somewhat related is the plaintiff's claim that she had been led to believe that a rate in the area of 3% would be available. When questioned more closely, the plaintiff and/or her husband could not explain the absence of any specific references to such a rate in the volume of records presented to the court. (The court does recall seeing one reference to such a rate.) There is no suggestion that such a rate was available other than in a distress situation, and there is no indication that at the time of the 2008 agreement, the plaintiff was in any financial straits sufficient to warrant possible applicability of a foreclosure-avoidance program available for those in financial distress. Rather, the evidence suggests that the purpose of those claimed statements that she should miss some payments was motivated by the need to put herself in a distress-type situation by failing to make payments, in order then to be potentially eligible for certain remedial programs.

Returning to the issues before the court, and approaching the issue of unclean hands from an alternate perspective:

> ".... The clean hands doctrine is applied not for the protection of the parties but for the protection of the court.... It is applied not by way of punishment but on considerations that make for the advancement of right and justice. The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue.... Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." (Internal quotation marks and citations, omitted.) *Thompson v. Orcutt*, 257 Conn. 301, 310, 777 A.2d 670, 676–77 (2001).

This also was echoed more recently in *Essaghof*:

> "For a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands.... The clean hands doctrine is applied not for the protection of the parties but for the protection of the court.... It is applied ... for the advancement of right and justice.... The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in wilful misconduct with regard to the matter in litigation.... The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked." (Internal citation and quotation marks, omitted. 177 Conn. App. 159.

The court cannot conclude that the evidence presented by the plaintiff was sufficient to establish the requisite level of inequitable conduct needed to establish unclean hands. The plaintiff points to inconsistent results for applications, one time a rejection due to income being too high and another time a rejection due to income being too low. There was no evidence as to the specific programs for which the plaintiff had applied and whether the applications themselves had different information. As already observed, excessive income might well be a disqualifier for a debt relief program, whereas insufficient income might be a disqualifier for a more mainstream (non-distressed) adjustment of loan terms, with an overlay of whether

the information submitted on the two occasions was essentially identical. (There is some indication in the record of financial ups and downs for plaintiff and her husband, over the relevant period of time.)

The court cannot ignore that the plaintiff seemed to be trying to take advantage of distress-relief programs even as early as 2008, when there was no apparent claim of financial distress (and again, the denial of at least one application, later, due to excessive income, suggests that there was no (or insufficient) perceived financial distress at that later date).

The defendant has submitted an affidavit relating to attorney's fees, in connection with its claimed entitlement to attorney's fees as part of the foreclosure process. The plaintiff has objected to the amount being claimed, asking for a hearing on this issue. As established by our Supreme Court in *Smith v. Snyder*, 267 Conn. 456, 470-81(2004) (and see especially, footnote 14), a party challenging a claim for attorney's fees is entitled to put the party claiming attorney's fees to its burden via an appropriate and if necessary contested evidentiary presentation. (If there were a total absence of any challenge to the claim, the court would be permitted to award attorney's fees based on the defendant's submission; see, *Medeiros v. Medeiros*, 175 Conn. App. 174 (2017).) In order to satisfy the plaintiff's right to challenge the claim, the court is scheduling argument on this remaining issue for July 30, 2018.

The court having concluded that the defendant has established a prima facie case entitling it to a foreclosure, and that the plaintiff has failed to establish a defense to the foreclosure phase of the proceeding, the court must address the defendant's request for a judgment of strict foreclosure notwithstanding the existence of equity in the property as reflected by its worksheet. In terms of dollars, the equity appears to be several hundred thousand dollars but in terms of

19

percentages, it would appear to be in the range of 10% of the estimated fair market value of the property. (The court further recognizes that the apparent net equity may have been reduced by expenses and charges, including interest, accruing since the date of the evidentiary submission for this phase of the action.) Accordingly, on the same date as scheduled for a hearing on the issue of attorney's fees, the court will entertain arguments concerning whether it is appropriate to have a strict foreclosure as requested or whether there should be a foreclosure by sale, and the court will entertain offers of updated evidence relating to the value of the property, and expenses and other charges including interest, to the extent that the parties believe that the information submitted at the last evidentiary hearing needs to be updated.

Conclusion

All other things being equal, people generally will try to pay as little as possible for a given product or service. The plaintiff was no exception, in that she wanted to pay, as little as possible for as long as possible, in repayment of the mortgage loan initially executed in 2003. The interest-only phase was about to end, and she sought to continue on an "as little as possible for as long as possible" basis beyond the anticipated commencement of interest-plus-principal payments at the end of 2008.

The plaintiff claims to have obtained names and other identifying information relating to representations that were made, and seems to have claimed to have recordings of conversations in which representations were made, but little if any of that detailed information was provided to the court, Instead, the court was provided with reports of what her husband had told her and her husband's reports of claimed

20

conversations, with the ever-present potential for misunderstandings and self-serving interpretation of undocumented statements.

The court appreciates that preservation of a long-term home is likely to be a high priority for a family, but the court must be concerned about facts and accuracy. The plaintiff's own historical documentation of the claimed history of the transactions – from many years ago – is demonstrably in error in significant aspects (and especially blurring the distinction between what was done by Washington Mutual and what was claimed to have been done by defendant). In Exhibit 4, the plaintiff recounted (in late 2010) her then-version of events. Much of the factual content is in conflict with undisputed facts, and raises concerns about advocacy overriding accuracy.

Exhibit 4 recites that the mortgage modification was for 3 years – it was for 5 years. While technically the earlier agreement had not expired, the interest-only phase was about to expire, and that was the apparent motivation for the modification. There was no evidence presented of a threat of foreclosure as a motivation for signing the new agreement, and the testimony at trial seemed to indicate a reluctant but voluntary signing of the agreement (with the jump in monthly payments due to principal payments otherwise imminent). And in this regard, the defendant (through its attorneys) could not have threatened foreclosure for the simple reason that there was only a 4-day interval between defendant taking over Washington Mutual's portfolio and the execution of the modification agreement.

The letter further complains about the increased interest rate without regard to the original agreement requiring principal payments starting in 2008, the impetus for the plaintiff seeking a modification in the first place. The letter continues to request deferral of principal payments, reinforcing the goal of minimizing payments

on an ongoing basis – which had been accomplished by the 2008 agreement (although at a higher interest rate).

Conversely, the letter acknowledges an inability to become current immediately ("we will even do our best to pay current as soon as possible"). If payments had not been made solely because the defendant had requested or instructed her not to do so, presumably that money would have been available to make up the shortfall as might later be required. If the plaintiff could not keep up with the payments required under the 2008 agreement, how could she have kept current with the somewhat higher payments that would have been required under the 2003 agreement (lower interest but including principal)?[11] (The plaintiff appears to have stopped making payments under the 2012 agreement within the first year of that agreement, during a period when the required payments were substantially less than had been made under the interest-only obligation of the 2003 agreement.)

Issues relating to claimed missing submissions or documents (requiring resubmission), delays in evaluating applications, and other indicia of inefficiencies do not rise to the level of inequitable conduct warranting invocation of the equitable defense of unclean hands. Cessation of all payments, relatively shortly after obtaining a modification that addressed most if not all of the elements of the plaintiff's modification-wish-list, cannot be excused due to the conduct of the defendant as established by the plaintiff. *Blowers*, discussed above, indicates the existence of limitations on the ability of a party, such as the plaintiff, to challenge the process by which a new agreement was reached, and the plaintiff has not established a basis under *Blowers* or otherwise for the court to decline to grant the defendant the relief being sought..

---

[11] At the time of the 2012 modification, the principal was increased by almost $350,000 from the prior level of $4.5 million, the increment apparently reflecting capitalization of the deficiency in payments to date.

Accordingly, the court finds that the defendant has established entitlement to a judgment of foreclosure, and the plaintiff has not established her equitable defense of unclean hands.[12] As set forth above, the debt, as of October 26, 2017 is determined to have been $5,917,276.33 (Exhibit Z), and the fair market value of the property as of that date was $6.7 million (Exhibit W). (These figures are subject to update at the hearing currently scheduled for July 30, 2018.) The court further awards $1200 for the appraisal (subject to adjustment at the forthcoming hearing). The final determination of attorney's fees will be made after the parties have had an opportunity for presentation and challenge of evidence in that regard, and the court will make a determination as to whether to order strict foreclosure (as requested by the defendant) or foreclosure by sale, based on any arguments made at the upcoming hearing.

POVODATOR, J.

*Decision entered in accordance with the foregoing. All counsel and self-represented parties of record notified 6-28-18. JDNO Notice sent 6-28-18.*

*Scott [illegible]*
*Assistant Clerk*

---

[12] In *Bruno v. Bruno*, 177 Conn. App. 599, 622 n.5 (2017), the court noted that even when unclean hands has been proven, there is no requirement that the inequitably-acting party be deprived of all relief, quoting *DeCecco v. Beach*, 174 Conn. 29, 35, 381 A.2d 543 (1977) for the proposition that unclean hands need not be a matter of absolutes but can be applied in a more measured manner, as appropriate. To the extent that the defendant might be chargeable with unclean hands based on the conduct of Washington Mutual prior to the transfer of its portfolio to the defendant (including preparation of the 2008 agreement executed shortly after that transfer to the defendant), the court would deem such a technical determination to be sufficiently attenuated from any actual conduct of the defendant as not to warrant any adjustment in the results described herein.